Case 2:23-cv-00994-GAM   Document 24   Filed 02/06/25   Page 1 of 10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

header
Case 2:23-cv-00994-GAM   Document 24   Filed 02/06/25   Page 1 of 10

Case 2:23-cv-00994-GAM   Document 24   Filed 02/06/25   Page 1 of 10

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ELIZABETH KUPSTAS-BADURINA** : | |
| Individually and **JOHN PARRSIEN, h/w,** : | |
| : | **CIVIL ACTION** |
| v. : | **No. 23-994** |
| : | |
| **THE TUTHILL CORPORATION, et al.** : | |

**McHUGH, J.**                                                                                            **February 6, 2025**

**MEMORANDUM**

This case arises from a skiing accident where the Plaintiff was seriously injured in a collision with a snowboarder. For better or for worse, Pennsylvania law is highly protective of ski slope operators, on the ground that downhill skiing is accompanied by inherent risks. In this case, the defendant ski resort seeks to shield itself from liability on the basis of an exculpatory release, and under the Pennsylvania Skiers Responsibility Act, which preserves assumption of the risk as a defense in cases involving downhill skiing. There are facts in dispute as to the enforceability of the release, but with the deadline for discovery having passed, there is no evidence to suggest that Plaintiff's accident represents anything more than an inherent risk of the sport. The resort is therefore entitled to summary judgment.

**I.      Relevant Background**

Plaintiff-Elizabeth Kupstas-Badurina describes herself as a "pretty good skier" with over 12 years of skiing experience and a season pass at Defendant's ski resort, Blue Mountain. Pl.'s Dep. 29:9-12, ECF 21-7 ("Dep."); Pl.'s Interrog. Resp. at #2, #5, ECF 21-6 ("Interrog."). When someone purchases a season pass online to ski at Blue Mountain, the checkout process requires the purchaser to sign an exculpatory agreement ("the Agreement") releasing the resort from liability for negligence, among other things. Dep. 14:23-15:6; Mot. Summ. Judg., Ex. A, ECF 21-

4. The Agreement also enumerates common risks of skiing, such as collisions with other skiers, and releases Defendant from liability for injuries associated with these risks. Ex. A, ECF 21-4. Plaintiff claims that to the best of her knowledge, Mr. Parrsien,[1] her husband, purchased the 2020-2021 season passes, and that he had authority to sign the Agreement on her behalf. Interrog. at #9, #12; Dep. 15:7-13. But the only copy of the Agreement on the record appears to be signed by Nathan Kupstas, Plaintiff's son. Ex. A, ECF 21-4. Plaintiff contends that Nathan was not responsible for purchasing the passes and that she does not know why Nathan's name appears on the Agreement. Dep. 13:10-14:13; Pl.'s Opp. to Summ. Judg. at 2, ECF 23 ("Resp.").

Nonetheless, Plaintiff visited the resort most weekends for the duration of the ski season using her season pass. Dep. 5:25-6:3, 63:15-64:1. Plaintiff had skied at Blue Mountain a total of 20-30 times prior to the date of her injury. Interrog. at #20. As a highly experienced skier and a frequent patron of Defendant's resort, Plaintiff admits that it was common for skiers and snowboarders to share trails at Blue Mountain. Dep. 63:11-14. She also admits that collision is a common risk associated with skiing, including collision between skiers and snowboarders. Dep. 36:15-21.

On March 20, 2021, Plaintiff, joined by her husband and son Matthew, went skiing at Blue Mountain. Dep. 26:12-20. After completing between eight to ten ski runs, Plaintiff embarked on the Falls trail – a double black diamond that she had already skied at least once that day. Dep. 35:3-12; Interrog. at #21. Plaintiff's brief in opposition summarily asserts that over the course of the day, snowboarders were seen engaging in tricks and launching themselves over hills on Falls

---

[1] Although Plaintiff testified that her husband's name is spelled "John Parisian," both the case caption and all briefing use the spelling "Parrsien." Dep. 23:13-16. For consistency, I adopt the caption's spelling.

slope, with no citation whatsoever to the record.[2]  Resp. at 9.  Midway down, a snowboarder merging onto Falls trail uphill of Plaintiff jumped off the hill and crashed into Plaintiff, his or her board striking Plaintiff's left clavicle.  Dep. 43:4-44:7.  Plaintiff says that she did not see the snowboarder approaching, but that the snowboarder was "out of control."  *Id*. 39:8-16, 40:20-41:2, 43:17-20.  Plaintiff spun down the mountain and was rushed to the hospital, where she was found to have eight fractured ribs, four left clavicle fractures, and multiple pulmonary emboli.  In addition to lasting pain, Plaintiff has also sustained serious medical bills for her medical treatment, surgery, and rehabilitation.  Interrog. at #16; Dep. 54:18-63:6.

This case has been pending since early March 2023.  The parties were originally given five months to conduct fact discovery, followed by a three-month extension, ECF 14, followed by yet another four-month extension.  ECF 18.  Defendant has timely moved for summary judgment in compliance with the current case management order.  Plaintiff opposes the motion on the merits, and in the alternative, seeks deferral of a ruling on the motion to allow for additional discovery.

**II.    Standard of Review**

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).  Of particular relevance here, where the moving party argues that "the facts established through the discovery process do not support the claim, the [responding] party must identify evidence of record sufficient to establish every element essential to the claim."  *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1308 (3d Cir. 1995).

---

[2] That is unsurprising as it appears that no depositions were conducted on the part of the Plaintiff, despite two extensions of the discovery deadline.

**III.    Discussion**

    **A.  The Exculpatory Agreement**

While it is undisputed that Plaintiff's name appears on the Agreement, reasonable questions remain as to the enforceability of the contract. Plaintiff maintains that her husband purchased the season passes and would have had authority to sign the contract on her behalf. But the name listed as signatory on the Agreement is that of her son Nathan, who she claims was not involved in the purchase process and would not have had authority to sign her name. Resp. at 3-4. Neither party offers an explanation as to why Nathan Kupstas' name is listed as signatory. *Id.*; Mot. Summ. Judg. at 2-3. If I construe the facts in Plaintiff's favor and assume that Plaintiff did not sign the Agreement herself, never authorized her son to sign the Agreement on her behalf and does not know how or why her name appears on the document, there is insufficient evidence to conclude that Plaintiff intended to be bound by the Agreement, making it unenforceable. *See, e.g. Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.,* 739 A.2d 133, 136 (Pa. 1999) ("[t]he law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract"). But there is no need to analyze this defense because of the bar presented by the statute protecting the ski industry.

    **B.  The Pennsylvania Skiers' Responsibility Act**

In 1980, Pennsylvania amended its Judicial Code to add a provision governing downhill skiing cases, known as the Pennsylvania Skiers' Responsibility Act. 42 Pa. Cons. Stat. § 7102(c). It began with a legislative finding that "there are inherent risks in the sport of downhill skiing." *Id.* § 7102(c)(1). The legislature followed by prescribing that "[t]he doctrine of voluntary assumption of risk" remained applicable in skiing cases, clarifying that it survived the legislature's

4

adoption of comparative negligence in 1976.[3]  *Id.* § 7102(c)(2).  Assumption of the risk is a common law doctrine, and the statute does not define it, but merely preserves it as a defense, so in practical terms it is case law that establishes the standard.

Historically, Pennsylvania courts had tended to characterize assumption of the risk as a conscious choice by a plaintiff to proceed in the face of a known risk.  *See, e.g., Fish v. Gosnell,* 463 A.2d 1042, 1049 (Pa. Super. 1983) ("preliminary and deliberate conduct done with an awareness of the specific risks inherent in the activity").  In *Carrender v. Fitterer,* 469 A.2d 120 (Pa. 1983), the Supreme Court analyzed the doctrine from a different conceptual perspective, framing the issue as the absence of a duty on a defendant's part, building in part on its earlier decision in *Jones v. Three Rivers Management Corp.,* 394 A.2d 546 (Pa. 1978).[4]  It unanimously held that when a plaintiff encounters risks that are "both obvious and avoidable, and nevertheless proceeds voluntarily to encounter them," the defendant owes no duty of protection.  *Carrender*, 469 A.2d at 125.  In applying PSRA, the Supreme Court has employed this "no-duty" formulation of assumption of the risk, relieving ski resorts of liability "so long as the injury suffered arose from a risk that was 'common, frequent and expected.'"  *Hughes v. Seven Springs Farm, Inc.,* 762 A.2d 339, 343 (Pa. 2000) (citing *Jones*, 394 A.2d at 551); *see also Chepkevich v. Hidden Valley Resort,*

---

[3] Following the passage of the Comparative Negligence Act, courts began to consider whether assumption of the risk should remain an absolute defense, a process culminating in *Rutter v. Northeastern Beaver County School District,* 437 A.2d 1198 (Pa. 1981), a plurality decision that fell just short of abolition. PSRA was designed to assure the continued applicability of the doctrine in ski cases by statute.

[4] *Jones* involved an injury inflicted by a foul ball at a Major League Baseball game, and the discussion centered on the inherent risks of a game where wooden bats launch projectiles in the general direction of spectators.

*L.P.,* 2 A.3d 1174, 1186 (Pa. 2010) (no duty to protect skiers from "risks that are common, frequent, and expected, and thus inherent to the sport").[5]

*Hughes* established a two-step test to determine whether the no-duty rule applies. 762 A.2d at 344. First, the plaintiff must be "engaged in the sport of downhill skiing at the time of her injury," and second, the risk of the injury at issue must be "one of the 'inherent risks' of downhill skiing." *Id*. When an injury stems from an inherent risk of skiing, the no-duty rule applies, and summary judgment in favor of the ski resort is warranted because "as a matter of law, [the plaintiff] cannot recover for her injuries." *Id.*

### C. Plaintiff's claims are barred by the PSRA

It is undisputed that Plaintiff was downhill skiing at the time of her injuries. Dep. 39:2-16. Consequently, the dispositive issue is whether the risk that caused Plaintiff's injury is one of the "inherent risks" of downhill skiing. Courts considering the PSRA have embraced a broad reading of "inherent risk." For the no-duty rule to apply, a party need not show that the injured skier assumed the "specific risk" that caused the injury, but instead must only show that the injury arose from a "general risk" inherent to the sport. *Mattei v. Tuthill Corp.,* No. 19-2196, 2023 WL 2287653, at *4 (M.D. Pa. Feb. 28, 2023). Under *Hughes*, inherent risks are those that are "common, frequent, and expected." 762 A.2d at 344.

The parties disagree as to the nature of the risk in this case. The Defendant ski resort argues that Plaintiff was injured in a standard collision – a risk clearly recognized by Pennsylvania courts

---

[5] In *Smith v. Seven Springs Farm, Inc.,* 716 F.2d 1002 (3d Cir. 1983), the Court of Appeals addressed PSRA without the benefit of the Supreme Court's decision in *Hughes*. *Smith's* involved discussion about primary versus secondary assumption of the risk is of questionable relevance considering subsequent applications of the statute by the Pennsylvania courts.

as inherent to the risk of skiing. Mot. Summ. Judg. at 13. Ample precedent supports that position. "Pennsylvania courts have consistently held that collisions with objects and other skiers are inherent risks of the sport of downhill skiing in the state of Pennsylvania." *Lin v. Spring Mountain Adventures, Inc.,* No. 10-333, 2010 WL 5257648, at *8 (E.D. Pa. Dec. 23, 2010); *see also Hughes,* 762 A.2d at 344 (concluding that collision with another skier was an inherent risk of skiing); *Bell v. Dean*, 5 A.3d 266, 273 (Pa. Super. Ct. 2010) ("[o]ur Supreme Court has specifically accounted for the exact risk of harm [Plaintiff's] claim arises from and categorized this risk – the risk of colliding with another skier or snowboarder – as a risk of downhill skiing that is common, frequent, expected and, therefore, inherent to the sport of downhill skiing").

Plaintiff responds with two counterarguments.

First, Plaintiff argues that the resort posted insufficient signage at the merger point on the trail where her accident occurred, or otherwise failed to adequately warn skiers of the danger at that trail point. Resp. at 9. Plaintiff's deposition is devoid of any testimony that she was unaware of the junction. Even if one assumes that the absence of such testimony was a function of the limited scope of the questions asked by the defense, no affidavit has been submitted by Plaintiff to support such a theory. Fed. R. Civ. P. 56(c)(4). Beyond that, whether this area on the slope required signage would seem to be a question requiring expert opinion, and Plaintiff has submitted none. The record is limited to an unsupported assertion by counsel. Finally, in *Bjorgung v. Whitetail Resort, LP*, the Third Circuit defined inherent risk broadly, holding that a failure to employ netting as a safety measure on a ski racecourse did not give rise to liability, because "[t]he cognizable risks inherent in ski racing are legion." 550 F.3d 263, 269 (3d Cir. 2008). Applying

7

that reasoning here, despite the risk of potential collisions, a resort's failure to mark every conceivable junction with signage would also fall within the inherent risks of the sport.[6]

Second, Plaintiff argues that the accident in question was not an "inherent risk collision" because the snowboarders present at Blue Mountain that day were particularly reckless. Resp. at 9. Specifically, Plaintiff's Responsive Brief avers that "through out [sic] the course of the day on March 20, 2021 observation was made and should have been made of snowboarders picking up speed to engage in tricks, launch themselves and 'catch-air' over the hill that formed on the Falls slope." *Id.* Once again, the record is deficient, consisting entirely of argument by counsel. There was no testimony to that effect in Plaintiff's deposition; her counsel has taken no depositions; and there are no affidavits from Plaintiff, her husband, or her son, who seemingly were there that day, or any other witness. It is also unclear whether the snowboarders' behavior was in any way atypical. Snowboarders performing tricks and "catching air" do not intuitively strike the Court as conduct out of the ordinary for the sport.[7]

Plaintiff relies on *Crews v. Seven Spring Mountain Resort,* 874 A.2d 100 (Pa. Super. Ct. 2005). There, a downhill skier was struck and injured by a snowboarder who was underage and drinking alcohol at the time of the collision. The plaintiff pleaded that the drinking had started early in the evening on the night of the accident, and that the resort had knowledge of prior episodes of underage drinking on site. Describing it as an issue of first impression, a divided panel of the

---

[6] I recognize that there is a distinction between recreational skiing and racing. But the latter undoubtedly has greater risks, yet the Circuit concluded that racers assumed the risk of inadequate safety precautions.

[7] It should also be noted that according to Plaintiff, she had already skied eight to ten runs that day, including Falls trail. Dep. 35:3-12; Interrog. at 21. On the record as it stands, virtually no conclusion can be drawn about the conduct of snowboarders that day. But if Plaintiff herself was aware of reckless actions by snowboarders, and continued to ski, that could have further implications in analyzing the applicability of assumption of the risk.

Superior Court held that the risk presented was not inherent to the sport of downhill skiing. In reaching this result, however, the Court emphasized that liability depended on the nature of the conduct the resort had failed to prevent: "if [plaintiff] had pleaded merely that he was injured in a collision with another, our inquiry would be ended." *Id.* at 102. Absent similar evidence of a risk unrelated to the sport of skiing itself, *Crews* does not provide Plaintiff with a path forward.

### D. There is no basis on which to reopen discovery

Counsel for Plaintiff seeks to overcome his failure to pursue discovery by invoking Federal Rule of Civil Procedure 56(d), which allows a party to oppose summary judgment on the ground that relevant facts are "unavailable" to them. In support, counsel attaches a declaration stating that he had "been assured that Defendant would also cooperate in discovery and produce witnesses." Resp. at 17. He then specifies the witnesses yet to be deposed. *Id.*

This position is patently lacking in merit. This case has been pending for close to two years. Extensions were liberally granted. Between the original case management order and two subsequent extensions, the parties had a full year within which to conduct fact discovery. The original case management order, and each subsequent revision, set a dispositive motion deadline *after* the expiration of fact discovery. Although my Guidelines for Counsel encourage attorneys to resolve discovery disputes with common sense, they do not in any respect limit the right of counsel to move to compel, as evidenced by this case, when I granted Defendant's motion to compel responses to its discovery requests. ECF 19.

The Circuit decision on which Plaintiff relies makes clear that "[a]n *adequate* affidavit or declaration specifies 'what particular information that is sought; how, if disclosed, it would preclude summary judgment; and *why it has not been previously obtained*.'" *Shelton v. Bledsoe,* 775 F.3d 554, 568 (3d Cir. 2015) (quoting *Dowling v. City of Phila.,* 855 F.2d 136, 140 (3d Cir.

9

1988) (emphasis added)).[8]  Where ample time for discovery has been granted by a series of case management orders with clear deadlines, and counsel simply fails to pursue discovery, he cannot later claim when facing a Rule 56 motion that information was "unavailable."  To hold otherwise would render case management orders meaningless.

IV.     **Conclusion**

Because Plaintiff was 1) engaged in downhill skiing, and 2) injured by collision with another snowboarder, a risk inherent to the sport, the PSRA eliminates Defendant's duty to Plaintiff as a matter of law and Plaintiff's negligence claim fails.  Defendant's Motion for Summary Judgment will therefore be granted.  An appropriate order follows.

　　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Gerald Austin McHugh  
　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

---

[8] In *Bledsoe,* the Court of Appeals was clearly concerned about a procedural anomaly in a case involving constitutional rights.  There, the plaintiff had vigorously conducted discovery and sought an extension *before* filing their opposition to summary judgment.  The district court did not grant the extension until after the briefing deadline had passed, and then failed to address counsel's well-documented explanation as to why the additional discovery was warranted before the motion could be fairly addressed.  Ct. Docket, *Shelton v. Bledsoe et al.,* No. 11-1618, (M.D. Pa., Aug. 29, 2011).  Here, in stark contrast, counsel simply ignored the court's scheduling orders.